Dr. Irwin ZANDMAN, D.D.S. on behalf of himself and all others similarly situated, Plaintiff,

v.

Clele J. JOSEPH, Donald C. Hoodes, Charles E. Hussey, II, William R. White, William Blackie, L. Roy Papp, Richard L. Sandin, Samuel D. Duame, Alvin Pontius, James C. Huntington, Jr., and Sullair Corporation, Defendants.

Salvatore LAURENZANO, Plaintiff,

v.

Clele J. JOSEPH, Donald C. Hoodes, Charles E. Hussey, II, William R. White, William Blackie, L. Roy Papp, Richard L. Sandin, Samuel D. Duame, Alvin Pontius, James C. Huntington, Jr., and Sullair Corporation, Defendants.

Civ. A. Nos. S83–0039, S83–0087.

United States District Court,
N.D. Indiana,
South Bend Division.

Aug. 28, 1984.

Thomas H. Singer, South Bend, Ind., Jules Brody, Edwin Mills, New York City, Gerald J. Rodos, John Innelli, Philadelphia, Pa., for plaintiff.

Franklin A. Morse II, Richard E. Deer, Jeffrey J. Tonner, South Bend, Ind., Stephen C. Sandels, Chicago, Ill., Leon R. Kaminski, LaPorte, Ind., Stuart D. Perlman, Chicago, Ill., Thomas G. Foley, Santa Barbara, Cal., Theodore R. Boehm, James H. Ham, III, David K. Herzog, Indianapolis, Ind., A. Barry Cappello, Goux, Romasanta & Cappello, Santa Barbara, Cal., for defendants.

## MEMORANDUM and ORDER

ALLEN SHARP, Chief Judge.

This cause is before the Court on the motion for class certification of plaintiffs, Dr. Irwin Zandman, D.D.S. [Zandman] and Salvatore Laurenzano [Laurenzano]. Plaintiffs allege that commencing September 25, 1980 and continuing through January 12, 1983, defendants Clele J. Joseph, Donald C. Hoodes, Charles E. Hussey, William R. White, William Blackie, L. Roy Papp, Richard L. Sandin, Samuel D. Duame, Alvin Pontius, James C. Huntington, Jr. and Sullair Corporation were responsible for publicly disseminating information containing a series of material misrepresentations and omissions regarding Sullair's progress in the design, development, testing and marketability of the Downhole Steam Generator [DSG]. Defendants oppose the motion generally and raise numerous defenses on their behalf. For the reasons discussed below, plaintiffs' motion for class certification is denied.

## I.

Zandman initiated this action by filing a complaint January 28, 1983 docketed in this court as Civil No. S83–39. Thereafter, Laurenzano filed suit, Civil No. S83–37, on March 1, 1983. On May 11, 1983, this Court entered an order consolidating both causes. Count I of the complaint arises under Section 10[b] of the Securities and Exchange Act of 1934, as amended, 15 U.S.C. § 78j[b], and the rules and regulations of the Securities and Exchange Commission promulgated thereunder. Count II alleges violations of common law fraud. Defendant Sullair is a corporation organized under Indiana law. At all times relevant to this action, Sullair was engaged in the design, manufacture, sale and rental of rotary screw air and gas compressors used in the oil and gas industry among others. At issue in this action is the development and testing of a downhole steam generator for the enhanced recovery of oil. When completed, the DSG was designed to inject steam heat below the land surface near a deposit of oil in order to thin out heavy crude thereby forcing oil deposits more freely to the surface. In essence, the DSG was designed to reach less accessible oil deposits. The individual defendants listed here were directors of Sullair during the proposed class period.[1]

The complaint specifically alleges that during the period commencing September 25, 1980, the date of the public issuance of a Sullair press release reporting the successful testing of the DSG, through and including January 12, 1983, the approximate date of the issuance of a Sullair press release reporting that Sullair was writing down its investment in the DSG, the defendants were responsible for a series of publicly disseminated misrepresentations and omissions regarding Sullair's progress in the development of the DSG. Included among the numerous public documents allegedly furthering and perpetrating a pat-

---

1. The individual defendants include Clele J. Joseph, prior to July 22, 1982 Senior Vice-President and a Director, on or about July 22, 1982 and thereafter Chief Executive Officer and President of Sullair; Donald C. Hoodes, President and Chairman of the Board until July 22, 1982; Charles E. Hussey II, Senior Vice-President; William R. White, Vice-President of Finance and Director; William Blackie, Director; L. Roy Papp, Director; Richard L. Sandin, Director; Samuel D. Duame, Director from approximately April 1981 to approximately September 1982; Alvin Pontius, Director; and, James C. Huntington, Jr., Director since approximately September 1982.

tern of false and misleading information were a press release issued by defendants and published in *The Wall Street Journal* on September 25, 1980; Sullair's Third Quarter Report to Shareholders for the fiscal year ordered December 31, 1980 issued on or about October 27, 1980; a report issued by defendants published in *The Wall Street Journal* on November 5, 1980; and Sullair's Annual Report to Shareholders for the fiscal years ended December 31, 1980 and December 31, 1981 issued on March 20, 1981 and March 26, 1982.

Plaintiffs' motion for class certification was filed June 30, 1983. All defendants filed briefs in opposition to plaintiffs motion on October 3, 1983. Additional well-researched briefs on the class certification issue were filed on April 19, 1984 by plaintiffs and on May 10, 1984 by defendants. A hearing was held on the Rule 23 motion on May 18, 1984 in South Bend, Indiana. Both parties filed post-hearing memorandums on their respective positions May 29, 1984. Jurisdiction over the federal claims is predicated upon the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78j[b]. Jurisdiction over the state claims is asserted pursuant to the well-established principles of pendent jurisdiction. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 [1966].

### II.

In order to be certified under FED.R. CIV.P. 23, a class action must satisfy each of the requirements of Rule 23[a] and qualify under at least one of the three subdivisions of Rule 23[b]. Rule 23[a] requires the plaintiff to satisfy the following requirements before a class can be certified: 1] the class must be so numerous that joinder of all members is impractical; 2] there must be questions of law or fact common to the class; 3] the claims of the representative party must be typical of the claims of a class; and 4] the representative party must fairly and adequately protect the interests of the class. *Patterson v. General Motors Corp.,* 631 F.2d 476, 480 [7th Cir.1980]. Here plaintiffs seek to cer-

tify a class under Rule 23[b][3] which requires the court to find that "questions of law or fact predominate over any questions affecting only individual numbers, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." In determining whether a matter should proceed as a class action, the court must make findings concerning each essential element of the class action rule. *Beebe v. Pacific Realty Trust,* 99 F.R.D. 60, 64 [D.Or.1983]. Accordingly, the Court turns to an analysis of each requirement of Rule 23[a] to determine whether it has been satisfied.

### A.

#### *Numerosity*

■ Rule 23[a][1] requires that "the class is so numerous that joinder of all members is impracticable." The fact that the number of class members cannot be determined with precision does not defeat certification. *Vergara v. Hampton,* 581 F.2d 1281, 1284 [7th Cir.1978], *cert. denied,* 441 U.S. 905, 99 S.Ct. 1993, 60 L.Ed.2d 373 [1979]. The issue of numerosity is resolved by consideration of the particular circumstances surrounding each case. *Cypress v. Newport News General & Nonsectarian Hospital Assn.,* 375 F.2d 648, 653 [4th Cir. 1967]; *Borowski v. City of Burbank,* 101 F.R.D. 59, 61 [N.D.Ill.1984].

■ Though the court has no information before it as to the exact number of people who purchased Sullair stock, plaintiffs estimate that during the first three months of 1981 alone [during which time Sullair common stock became listed on the New York Stock Exchange] about three million shares were traded. Thus, these transactions involved at least several hundred, and possibly, several thousand different purchasers. Since a good faith estimate of the number of class members is sufficient to satisfy the numerosity requirement, *Borowski,* 101 F.R.D. at 61, and joinder of several hundred people is clearly impractical, this Court deems the numerosity requirement of Rule 23[a][1] satisfied.

### B.

### *Commonality*

Under subsection [a][2] of the rule, plaintiffs must demonstrate that common questions of law or fact are held by all members of the proposed class. The essential question with respect to common issues is whether those issues predominate over issues affecting only individual class members. Plaintiffs allege that a common thread of misrepresentations and omissions about the DSG apply throughout the class period. They maintain that questions common to all class members here relate to the existence, materiality and character of the misrepresentations and omissions in Sullair's published written reports and cite to numerous "common and continuing course of conduct" cases that were appropriate for class certification. *See, e.g., Grossman v. Waste Management, Inc.*, 100 F.R.D. 781 [N.D.Ill.1984]; *Piel v. National Semiconductor Corp.*, 86 F.R.D. 357 [E.D.Pa.1980]; *Hochschuler v. G.D. Searle & Co.*, 82 F.R.D. 339 [N.D.Ill.1978].

Defendants counter with several arguments in support of their contention that individual issues predominate over common issues. They state that Sullair, the investment community and the media disseminated numerous varying statements about the DSG over the alleged 27-month class period. They argue that such statements reflect that the underlying facts concerning the DSG were evolving and changing throughout the alleged class period as developmental work and continued testing took place and that various external economic, political and scientific factors affected Sullair's activity and, over time, made the DSG less feasible and ultimately unnecessary. As such, the questions at issue in plaintiffs' 10b–5 claims—falsity, materiality and scienter—would vary significantly at every stage in the alleged class period.

In support of their position, defendants place great reliance on *J.H. Cohn & Co. v. American Appraisal Assoc., Inc.*, 628 F.2d 994 [7th Cir.1980]. The plaintiffs there sought to represent everyone who bought securities in a mutual fund over a 33-month period. They claimed that the defendants misrepresented the financial condition of American Appraisal in a prospectus, a variety of annual and interim documents filed with the SEC, press releases, letters to shareholders and other communications to the financial community. The court held that:

> The alleged material misrepresentations were contained in several different oral and written communications issued at various times during this period. Individual class members would thus have to establish that information available to them prior to their purchases contained material misrepresentations or omitted to state material facts. A purchaser following only the June 1971 prospectus would face a different question of proof on the materiality issue than one purchasing in 1974 after a great deal more information concerning the American Appraisal was available. Likewise, on the issue of scienter, a purchaser early in the period would face different proof concerning the defendants' willfulness or recklessness in issuing or omitting to issue material information than a purchaser later in the period.

*Id.* at 998 [footnote omitted]. The Seventh Circuit rejected the plaintiffs' argument that an allegation that defendants had engaged in a common course of conduct consisting of a series of interrelated misrepresentations and omissions made the claims appropriate for class treatment. The Court said:

> We feel the district court did not abuse its discretion in concluding that the changing factual situation over a thirty-three month period undercuts the predominance of any common course of conduct.

*Id.* at n. 3.

■ The factual circumstances of some cases make them more amenable to class treatment than others. Having reviewed the record presented here, the Court cannot agree with plaintiffs' argument that class certification is appropriate on the issue of commonality. The Court finds this case

closely analogous to the factual situation in *J.H. Cohn*. During the 27 months of the alleged class period, Sullair released 57 public statements consisting of 36 press releases, 7 quarterly reports, 2 annual reports, 7 Form 10–Qs and 2 Form 10–K's filed with the Securities and Exchange Commission, a prospectus for a public offering of additional common stock and 2 proxy statements. Of these, approximately 22 dealt with the DSG. A careful study of these documents by the Court indicate that Sullair's announcements differed to a marked degree as the development of the DSG progressed.[2]

The essence of the claims in this action concerns the outcomes of a number of tests conducted at various stages of development of the D.S.G. As in *J.H. Cohn*, the cause of action possessed by an individual who bought Sullair stock based on the September 24, 1980 press release heralding the successful completion of the first downhole test and the cause of action of one purchasing stock on the basis of Sullair's First Quarter Report in 1982 detailing the slow development and setbacks in the testing program would be substantially different in terms of falsity, materiality and scienter.

Like the Seventh Circuit in *J.H. Cohn & Co.*, other courts dealing with similar numbers and variety of public statements consistently refuse to certify class actions in securities fraud cases. *See, e.g., Trattner v. American Fletcher Mortgage Investors*, 74 F.R.D. 352 [S.D.Ind.1976] [defendant issued 47 public statements describing loan portfolio and loan loss reserves at various times during a 27-month class period]; *Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 482 F.2d 880 [5th Cir.1973] [inability of plaintiffs to prove similarity of writings makes class treatment inappropriate].

■ With respect to the state fraud claims, the Court further finds that common issues would not predominate in that the fraud issues would have to be tried in accordance with the substantive law of the state of each class member. While noting the authority cited by plaintiffs, *In re Saxon Securities Litigation*, [Current] Fed. Sec.L.Rep. [CCH] ¶ 99, 691 at 97, 776–77 [S.D.N.Y. February 23, 1984] favoring class certification of common-law claims, this Court is in agreement with those courts which oppose the application of the forum state fraud law to the claims of all class members. *See, e.g., Piel v. National Semiconductor Corp.*, 86 F.R.D. at 367 n. 8; *Elster v. Alexander*, 76 F.R.D. 440, 442 [N.D.Ga.1977], *appeal dismissed*, 608 F.2d 196 [5th Cir.1979]; *Seiden v. Nicholson*, 69 F.R.D. 681, 686 [N.D.Ill.1976]. Following the dictates of *Klaxon Co. v. Stentor Electric Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 [1941], in the case of any state law claim, a federal court must apply the law the forum state would use, including that state's choice of law rules.

■ Moreover, there is no Indiana choice-of-law rule that would allow the

---

2. Compare the press release issued by Sullair on June 8, 1981 stating that "[w]hile routine problems have been experienced in the testing, including corrosion downhole, modifications have been made to correct such difficulties customarily encountered in major development projects" with the first quarter report of 1982 detailing yet another test which stated that "[t]he development of these systems has been much slower than we had anticipated, but we are now moving ahead rapidly." It continues:

Considerable further progress has been made on the development of both the Downhole Steam Generator and the Wellhead Steam Generator for the enhanced recovery of heavy crude oil. The development of these systems has been much slower than we had anticipated, but we are now moving ahead rapidly.

In April we commenced a demonstration-test of the Downhole Steam Generator at the well of a major oil company. The objective of the test was to operate the system continuously for 28-days. This test was interrupted after 17 days of continuous downhole operation. Preliminary indications are that the interruption was caused by defective exhaust tubing which resulted in a loss of air pressure to the Downhole Steam Generator. The 17 days of operation, during which time approximately 7,000 barrels of high quality steam were injected, represents the longest known continuous downhole operation ever performed at this high of a power level. Testing will be resumed upon correction of the problem. . . .

fraud law of a single state to be used to govern plaintiffs' alleged class action. Indiana ordinarily follows the *lex loci delicti* choice-of-law rule for torts, and thus for a fraud claim uses the law of the place where the loss was suffered. *Eby v. York-Division, Borg-Warner*, 455 N.E.2d 623, 626 [Ind.App.1983]. That rule would require use of the law of the state where each class member suffered his or her pecuniary loss. Were the modern "most significant contacts" choice-of-law rule applied, the analysis would be even more complex but would lead in the case of most class members to application of the same law as under the *lex loci delicti* rule. *See Restatement [Second] of Conflict of Laws* § 148[2] & comments e–j.

For these reasons and the fact that fraud law among the states can differ significantly—including, for example, whether and when statements of opinion or predictions of future events can constitute fraud, *compare Canfield v. Rapp & Son, Inc.*, 654 F.2d 459, 466–67 [7th Cir.1981] [Indiana law] *with Peterson Indus. v. Lake View Trust & Savings Bank*, 584 F.2d 166, 169 [7th Cir.1978] [Illinois law], the common law fraud claims will not be maintained on a class basis and this Court concludes that the commonality requirement of Rule 23[a][2] has not been met.

## C.

### Typicality

Even if this Court were to find that plaintiffs have sufficiently alleged a common course of conduct presenting common questions of law or fact for purposes of Rule 23[c][2], it could not hold that plaintiffs claims are typical of the entire class they seek to represent as required by Rule 23[a][3].

█ It is well established law that:

The presence of even an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiffs' representation.

*J.H. Cohn*, 628 F.2d at 999 citing *Koos v. First National Bank of Peoria*, 496 F.2d 1162, 1164–65 [7th Cir.1974].

Plaintiffs rely on a "fraud on the market theory." [3] Though the Seventh Circuit has not addressed the validity of the theory, this court accepts it as valid for purposes of this motion.[4] Under this theory, "a plaintiff ... need not allege individual reliance but only that the plaintiff relied upon the integrity of the market price of the security which was distorted by the impact of the particular misstatements." *Grossman* 100 F.R.D. at 786 citing *In re LTV Securities Litigation*, 88 F.R.D. 134, 142 [N.D.Tex.1980]. Reliance is presumed once it is established that the material representations affected the price of stock traded on the open market. *Grossman*, 100 F.R.D. at 786. However, the presumption may be rebutted by proof that the plaintiff purchased in reliance on the market, *Id.* at 787, thus vitiating the typicality of a named plaintiffs' claims in a fraud on the market case.

Defendants claim that both Zandman and Laurenzano have no claim, a claim different from the class and/or are subject to atypical defenses with respect to claims they do share with the class. Turning first to Zandman, defendants enumerate a host of facts which serve to subject him to numerous unique defenses. These include: 1] Zandman's personal contacts with Sullair officers, Chevron employees and securities analysts; 2] attendance at special meetings for securities analysts and industry conferences; and 3] the enormity of Zandman's $3,000,000 investment and the great num-

---

**3.** The fraud on the market theory has been accepted by other courts in this circuit. *See, e.g., Mottoros v. Abrams*, 524 F.Supp. 254 [N.D. Ill.1981]; *Grossman v. Waste Management*, 100 F.R.D. 781 [N.D.Ill.1984]; *McNichols v. Loeb Rhoades & Co.*, 97 F.R.D. 331 [N.D.Ill.1982].

**4.** For a thorough discussion of the fraud on the market theory see Note, *The Fraud-on-the Market Theory*, 95 HARV.L.REV. 1143 [1982].

ber of trades in Sullair [more than 150 trades].

■ Though reliance on factors other than the market may rebut the presumption of reliance, if a plaintiff relies on statements of third parties that merely reiterated, digested or reflected the misstated information that forms the basis of the securities fraud claims, plaintiff has not relied on "factors wholly extraneous to the market." *Grossman*, 100 F.R.D. at 788.

■ The evidence before the Court in deposition testimony is replete with instances where Zandman held conversations with company officials or other sources concerning the DSG. Starting in September 1980, Zandman called Sullair monthly to get a current report as to the prospects of the DSG and spoke repeatedly with high level Sullair officials [Zandman Dep. at pp. 221, 234]. In April 1981, he attended a shareholders' meeting and also a special meeting for securities analysts. At that meeting, he claims a Sullair officer assured him that the system worked [Zandman Dep. at p. 148]. In May 1981 Zandman attended the Offshore Technology Conference in Houston, Texas where he again conferred with Sullair officials and a former Chevron employer who allegedly assured him the DSG "worked" [Zandman Dep. at 321–25, 386]. Thus, Zandman did not rely on the statements of third parties who merely reiterated, digested or reflected the purported misrepresentations of the defendants. He has admitted to direct reliance upon personal telephone conversations and meetings with Sullair officials and upon the statements of an ex-employee of Chevron, an important potential customer of the DSG. Even the securities analysts consulted by Zandman testified to numerous personal contacts with Sullair and Chevron officials and visits to the operating site [Arthur Rade Dep. at pp. 52–64; Sara Gottlieb Rosenbaum Dep. at pp. 29–

32]. Thus, the Court finds Zandman subject to the colorable defense of non-reliance on the market.[5]

Defendants further argue that the size of Zandman's investment [$3,000,000], the number of trades in Sullair stock [in excess of 150 trades] and his knowledge of Sullair operations subject him to the defense of a sophisticated investor. Again, defendants place heavy emphasis on the Seventh Circuit's opinion in *J.H. Cohn*. In *J.H. Cohn*, the court held that in a fraud-on-the-market case an overly sophisticated plaintiff may not represent the class purportedly defrauded because such plaintiff may not have been justified in relying upon the same representations which were relied upon by the class as a whole. *J.H. Cohn*, 628 F.2d at 998–99. The court stated:

> Furthermore, the defendants arguably have available a defense peculiar to the named plaintiff, The Evergreen Fund, that is less available against the other class members. The Evergreen Fund is a sophisticated investor very familiar with financial statements. Such an investor may not be a justified in relying on any material misrepresentations or omissions of material facts as other purchasers of American Appraisal stock. While the availability of a defense of justifiable reliance is not clearly settled, this court has indicated that the presence of even an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representation.

*Id.*

Plaintiffs seek to distinguish *J.H. Cohn* on the basis that Zandman is not an institutional investor as was the plaintiff in *J.H. Cohn* citing *Grossman, supra*, and *Ridings v. Canadian Imperial Bank*, 94

---

5. Whether the oral representations were similar to those disseminated by written means is a point of contention in this action. For purposes of certification of a class, however, no final determination on the merits of this issue need be made at this time. A preliminary finding that a proposed representative is subject to a unique defense is sufficient. *In re Saxon Securities Litigation*, [Current] Fed.Sec.L.Rep. [CCH] ¶ 99, 691 at 97, 776–77 n. 1 [S.D.N.Y. February 23, 1984] citing *Kline v. Wolf*, 702 F.2d 400, 403 [2nd Cir.1983].

F.R.D. 147, 152 [N.D.Ill.1982] in support of their contention. As every case must turn on its own set of facts, this Court must reject the distinction drawn between an institutional versus a non-institutional investor in *Grossman* and *Ridings*. Zandman had invested approximately $3,000,000 in Sullair stock as a result of over 150 trades. He admits to being a sophisticated investor who spends a substantial portion of every day planning his investments and calling his stockbrokers [Zandman Dep. at pp. 36, 254, 317–18]. He persisted in extracting information from company officers and in-house analysts at various brokerage houses. He engaged in a personal study of the development and technology of the DSG as exemplified by trips to highly technical trade conferences [Off-Shore Technology Conference] in Houston, Texas in May 1981, the Annual Meeting of Sullair Corporation in Michigan City, Indiana in April 1981 and attendance at a meeting restricted to Securities Analysts following the General Annual Meeting. Such characteristics are more similar to the institutional investor in *J.H. Cohn* than to the average investor held typical in securities cases.

Like Zandman, Laurenzano is also subject to unique defenses. Defendants' chief allegations against Laurenzano as to typicality are: 1] that Laurenzano has no claim in that he has repeatedly misrepresented his transactions and thereby concealed the fact that he profited from his transactions in Sullair stock; and 2] that he is a "professional plaintiff" who has made only selective discovery of his performance as putative or certified class representative in his numerous other lawsuits. Pursuant to his sworn answers to Sullair Interrogatory No. 29 and Sullair Document Production Requests Nos. 1–3, Laurenzano disclosed that he had taken part in only two transactions in Sullair stock—a purchase of 300 shares

at 12¼ and a subsequent sale of 100 shares at 15⅞.

Consistent with the above revelations, Laurenzano testified at his first deposition that he made only one purchase of Sullair shares in January 1982, that he sold 100 of those shares in February 1982, that he owned the remaining 200 shares at the time of his deposition and that he had not thereafter purchased any additional shares [Laurenzano Dep. of July 13, 1983 at pp. 9, 10, 19–20, 119–20]. On June 29, 1983, counsel for Laurenzano submitted to the Court a sworn affidavit representing the same two stock transactions. At his second deposition, Laurenzano testified to his gross and net loss based upon those two transactions and that he still owned the remaining 200 shares. [Laurenzano Dep. of January 16, 1984 at pp. 14–16, 58–59, 87].

However, Anthony Gregorio, one of Laurenzano's stockbrokers, testified to and produced business records establishing that in his dealings with Laurenzano alone, Laurenzano consummated not two but rather nine transactions in Sullair stock. Three of the concealed transactions were in a brokerage account that Laurenzano failed to disclose.

 Thereafter, Laurenzano filed an affidavit including an exhibit purporting to show all his Sullair trades. Pairing Laurenzano's purchases and sales on a first in—first out basis,[6] defendants compute a profit for Laurenzano's transactions in Sullair thereby negating any claim he may allege to have in this suit.[7] Without deciding whether Laurenzano had reaped a profit in his Sullair transactions, the fact that Laurenzano's total number of transactions in Sullair is still unknown, and the record lends some credence to the possibility of

---

**6.** For federal tax purposes, purchases and sales are paired on a first in—first out basis. Treas. Reg. § 1.1012–1[c][1]. The only way a taxpayer can alter that for transactions done in the broker's name is to specify to his broker the particular stock to be sold. The taxpayer must then receive "confirmation of such specification ... in a written document from such broker ..."

Treas.Reg. § 1.1012–1[c][3]. Neither Laurenzano nor his broker[s] has produced such documents in this case.

**7.** Defendants show a profit of $1,533.83 on all the 1100 shares Laurenzano purportedly purchased during the class period.

monetary gain, the court concludes that Laurenzano is subject to the defense that Laurenzano's claim is atypical.

Defendants' second contention is that Laurenzano is a professional plaintiff who has allowed only selective discovery of his performance as putative class representative. The Court finds this argument to be without merit and will address it no further.

### D.

### *Adequacy*

As a final matter, the Court turns to the adequacy of representation requirement of Rule 23[a][4]. Generally, this requirement is met where interests of the class representative coincide with other members of the class and where the class representative and his attorney are prepared to prosecute the action vigorously. *Grossman,* 100 F.R.D. at 789–90; *Ridings,* 94 F.R.D. at 154. Defendants argue that Zandman's and Laurenzano's failure to make full disclosure of all their transactions in Sullair stock impeaches their credibility.[8]

In *Kline v. Wolf,* 702 F.2d 400 [2nd Cir. 1983], the court affirmed the denial of class certification on the ground that the credibility of each of the plaintiffs was in question. There one plaintiff testified that he had relied upon a report which he later admitted did not exist at the time he allegedly relied upon it. Another refused to answer proper discovery questions. *Id.* at 403. The court stated that the district court cannot be expected to resolve the credibility issue but rather need only determine that evidence on the record shows that plaintiff's credibility is vulnerable to attack. *Id. See also, Pazirer v. Wolf,* 663 F.2d 365, 368–69 [2nd Cir.1981], *vacated on other grounds sub nom. Price Waterhouse v. Panzirer,* 459 U.S. 1027, 103 S.Ct. 434, 74 L.Ed.2d 594 [1982] [affirming denial of class certification because of plaintiff's

"lack of credibility"]; *Weintraub v. Texasgulf, Inc.,* 564 F.Supp. 1466, 1471 [S.D.N.Y. 1983] [class certification denied in part because plaintiff's "[investment] conduct will have a negative impact on his credibility at trial"].

Zandman disclosed in discovery numerous transactions in Sullair stock. However, the deposition of Arthur M. Schwartz, one of Zandman's many stockbrokers, has revealed eleven undisclosed transactions in Sullair shares by Zandman in a brokerage account he failed to disclose. Among these were significant undisclosed sales by Zandman at a profit, near the market high and long before Zandman testified he began selling his Sullair shares.

The deposition of Richard Rosenstock, another broker, has revealed three more previously undisclosed transactions in Sullair stock by Zandman during the class period in two previously undisclosed accounts and two additional undisclosed transactions by Zandman which did not take place within the class period.

Defendants further contend that the deposition testimony of Zandman's brokers impeach his credibility in yet another respect. In response to Sullair's Interrogatory No. 1, Zandman stated that his social security number was 80–34–9454. Zandman further testified that he controlled numerous accounts, some of them in his name and some in other Zandman names and that the funds used to purchase the Sullair stock in the various accounts belonged to him or to him and his wife jointly though he refused to disclose the source of his funds.

Discovery from Zandman's brokers has established that in a total of 23 accounts involving the names of 6 different persons in which he traded Sullair stock, Zandman used 18 different tax identification numbers. In accounts listed in his name, Zandman used six different tax identification numbers; accounts held jointly with rela-

---

8. Defendants filed motions for sanctions pursuant to Rule 37, F.R.Civ.P. on March 19, 1984 [Defendant Hoodes] and March 20, 1984 [Sullair Corporation and all individual defendants with the exception of Hoodes]. Such motions are still pending as the Court has deferred ruling on them.

tives or in his relatives' names alone list yet other tax identification numbers with these accounts using different or inconsistent numbers as well.

Zandman's transactions in Sullair stock are not simply peripheral issues in this action—they comprise the very core of this case. A record such as this, creating more questions than are answered, cannot but raise doubts as to the credibility of Zandman and his adequacy to serve as a representative for a putative class.

In like manner, Laurenzano's testimony is riddled with omissions and inconsistencies. Deposition testimony from Laurenzano's broker, Antonio Gregorio, revealed numerous undisclosed trades made by Laurenzano in Sullair stock. Yet after these revelations and to support his claim that he still retains the 200 shares of original shares upon which he based his damage claims, Laurenzano alludes to additional transactions in Sullair with yet another stockbroker, transactions that are undocumented and a broker who remains nameless.

Until such time as plaintiffs can give a plausible accounting to the questions raised, the Court cannot find they are adequate representatives within the meaning of Rule 23[a][4]. The Court makes no judgment on the merits of the credibility issue but notes that it will take significant amounts of time and energy to resolve in the course of this proceeding.

Since only the requirement of Rule 23[a][1] is satisfied, the Court need not address the 23[b][3] issue of predominance and superiority. Accordingly, it is the order of this Court that the motion for class certification of plaintiffs, Dr. Irwin Zandman and Salvatore Laurenzano, be, and is hereby, DENIED. SO ORDERED.